IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHARON WHITEHEAD, )
*individually and as executrix of the estate of* )
*James T. Whitehead, deceased*, )
)
Plaintiff, )
)
v. ) 1:18CV91
)
AIR & LIQUID SYSTEMS )
CORPORATION, et al., )
)
Defendants. )

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiff Sharon Whitehead brings this wrongful death action on behalf of herself and the estate of her late husband, James T. Whitehead, who died of mesothelioma. (ECF No. 117.) Before the Court are motions for summary judgment filed by Defendants The Aurora Pump Company, Anchor Darling Valve Company,[1] Fisher Controls International LLC, The William Powell Company, Covil Corporation, and Viking Pump, Inc. (collectively, the "Moving Defendants"). (ECF Nos. 309; 311; 313; 314; 316; 319.) For the reasons stated below, all six motions will be granted.

**I. BACKGROUND**

As alleged in the complaint, Mr. Whitehead was exposed to a myriad of asbestos-containing products and equipment at certain worksites over the course of his career as a sheet

---

[1] Anchor Darling Valve Company was improperly named as Flowserve Corporation in the amended complaint. (*See* ECF Nos. 117 at 2; 311 at 1 n.1.)

metal and maintenance mechanic. (ECF No. 117 ¶¶ 51–57.) He was diagnosed with mesothelioma—a cancer caused by the inhalation of asbestos fibers—on November 19, 2017, and succumbed to that disease on February 18, 2018. (*Id.* ¶¶ 2, 50; ECF No. 331-1 at 2.)

Plaintiff initiated this action against thirty-eight product manufacturers, facility operators, and insurers, seeking to recover damages related to Mr. Whitehead's cancer. (*See* ECF No. 117 ¶¶ 10–47, 110–14.) The complaint asserts four claims against the Moving Defendants: (1) defective design; (2) failure to warn; (3) breach of implied warranty; and (4) gross negligence. (*Id.* ¶¶ 58–95.) Mr. Whitehead was not deposed before his death; consequently, Plaintiff relies primarily on testimony from individuals who worked alongside him in order to establish the identity of the asbestos-containing products to which he was allegedly exposed, as well as the severity and frequency of any exposure.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (quotations omitted). The role of the court at summary judgment is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable"

2

to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324.

### III.   DISCUSSION

To prevail in an asbestos-related product-liability action under North Carolina law,[2] a plaintiff must establish that he was "actually exposed to the alleged offending products." *See Wilder v. Amatex Corp.*, 336 S.E.2d 66, 68 (N.C. 1985). Consistent with that requirement, the

---

[2] As a federal court sitting in diversity, this Court is bound to apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "In tort actions, North Carolina courts adhere to the rule of lex loci and apply the substantive laws of the state in which the injuries were sustained." *Johnson v. Holiday Inn of Am.*, 895 F. Supp. 97, 98 (M.D.N.C. 1995); *Boudreau v. Baughman*, 368 S.E.2d 849, 854 (N.C. 1988) ("This Court has consistently adhered to the lex loci rule in tort actions."). Mr. Whitehead's alleged exposure to Moving Defendants' products occurred in North Carolina, as did the diagnosis of his mesothelioma and his eventual death. Accordingly, the Court will apply North Carolina's substantive law.

3

Fourth Circuit has further held that a North Carolina asbestos plaintiff "'must prove more than a casual or minimum contact with the product' containing asbestos in order to hold the manufacturer of that product liable." *See Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 716 & n.2 (4th Cir. 1995) (applying the threshold causation standard outlined in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir. 1986), to a North Carolina case). Instead, to support a reasonable inference of substantial causation from circumstantial evidence, a plaintiff must introduce "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Id.* (quotations omitted). Federal courts have long used this "frequency, regularity, and proximity" test—the "*Lohrmann* test"—to evaluate proximate causation in asbestos cases arising under North Carolina law.

Plaintiff argues that a modified version of the *Lohrmann* test should be applied in cases involving mesothelioma, as "scientific evidence [shows] that brief or low-level exposures to asbestos" can cause the disease. (*See, e.g.*, ECF No. 331 at 12.) However, this Court recently rejected that argument, *see Connor v. Norfolk S. Ry. Co.*, No. 1:17CV127, 2018 WL 6514842, at *3 n.5 (M.D.N.C. Dec. 11, 2018), and does so again here.[3]

Moving Defendants contend that, based on the evidence produced during discovery, Plaintiff cannot meet the threshold causation requirements for actionable asbestos exposure

---

[3] Federal courts routinely apply the "frequency, regularity, and proximity" test—as specifically set forth in *Lohrmann* and *Jones*—in mesothelioma cases arising under North Carolina law. *See, e.g.*, *Haislip v. Owens-Corning Fiberglas Corp.*, 86 F.3d 1150 (table), 1996 WL 273686, at *2 (4th Cir. May 23, 1996) (per curiam); *Finch v. BASF Catalysts LLC*, No. 1:16-CV-1077, 2018 WL 4101828, at *4 (M.D.N.C. Aug. 22, 2018); *Starnes v. A.O. Smith Corp.*, No. 1:12-CV-360-MR-DLH, 2014 WL 4744782, at *3 (W.D.N.C. Sept. 23, 2014); *Jandreau v. Alfa Laval USA, Inc.*, No. 2:09-91859-ER, 2012 WL 2913776, at *1 n.1 (E.D. Pa. May 1, 2012).

4

described above.  (*See, e.g.*, ECF Nos. 309 at 1; 311 at 1–2; 315 at 1; 317 at 1–2; 318 at 1; 320 at 5.)  Because the relevant evidence varies according to defendant, the Court will address each of the summary judgment motions separately.

### A. The Aurora Pump Company

The Court begins with Defendant The Aurora Pump Company's ("Aurora") motion for summary judgment.  (ECF No. 309.)  Aurora contends that the record contains "no evidence on which a reasonable jury could base a finding that Aurora's conduct was a proximate cause of Mr. Whitehead's mesothelioma." (ECF No. 310 at 13.)  It is Plaintiff's burden, therefore, to show that the record contains facts from which a reasonable jury could conclude that Mr. Whitehead was "actually exposed" to Aurora-attributable asbestos, as required by *Wilder*, and that this exposure occurred with sufficient frequency, regularity, and proximity to satisfy the *Lohrmann* test.  *See Young v. Am. Talc Co.*, No. 1:13CV864, 2018 WL 9801011, at *3 (M.D.N.C. Aug. 3, 2018).  The Court concludes that Plaintiff has failed to carry this burden.

According to Plaintiff, Mr. Whitehead "worked with Aurora['s] asbestos-containing pumps, as well as asbestos gaskets, packing, and insulation associated with those pumps" while employed as a maintenance mechanic at the Schlitz/Stroh Brewery in Winston-Salem (the "Brewery") from 1972 to 1973, and again from 1983 to 1999.  (ECF No. 331 at 1; *see also, e.g.*, ECF Nos. 331-2 at 9–10; 331-8 at 14.)  However, there is little evidence—direct or circumstantial—that Aurora actually provided asbestos-containing products to the Brewery.  Sales records proffered by Plaintiff indicate that at least some seals, packing rings, and gaskets were delivered by Aurora to the Brewery during the relevant time period.  (*See* ECF No. 331-

5

13.) Plaintiff does not, however, identify which of those delivered products, if any, contained asbestos. Instead, Plaintiff broadly claims that "Aurora sold virtually all of its pumps with asbestos-containing gaskets and packing," (ECF No. 331 at 6)—the inference being that those sold to the Brewery must have contained asbestos as well. Yet the record evidence cited by Plaintiff—which describes some, but explicitly not all, Aurora products as containing asbestos—significantly weakens that inference. (*See* ECF Nos. 331-9 at 7 (acknowledging that "*some* pumps and pump systems . . . *may* have contained . . . asbestos-containing gasket and packing material"); 331-10 at 5, 7 (explaining that "only two" standard Aurora products contained asbestos, and that pump-packing would sometimes be customized to fit specific requirements); 331-11 at 4 (recalling that some Aurora pumps, from "inception," were "asbestos free").)

The only evidence tending to show the presence of Aurora-attributable asbestos products at the Brewery comes in the form of deposition testimony from two of Mr. Whitehead's former coworkers—Robert Dorsett and Grady Draughn. Mr. Dorsett believes that the original gaskets and packing on Aurora pumps at the Brewery contained asbestos, though he "figure[s] . . . they stopped using it" sometime in the 1980s. (*See* ECF No. 331-3 at 11.) Mr. Draughn testified that, in hindsight, some pump gaskets used at the Brewery— including "maybe Aurora['s]"—"probably had asbestos in them." (ECF No. 331-4 at 13.)

Viewed in the light most favorable to Plaintiff, a reasonable jury could perhaps find— either through the inference discussed above, or based on Mr. Dorsett and Mr. Draughn's limited testimony—that Aurora provided some asbestos-containing products to the Brewery. However, even assuming the existence of some such products at the worksite, Plaintiff has

6

failed to produce evidence demonstrating that Mr. Whitehead was exposed to such products with the frequency, regularity, and proximity required under the *Lohrmann* test.

The record shows that, in his role as a maintenance mechanic at the Brewery, Mr. Whitehead was responsible for repairing pumps and replacing faulty parts. (*See* ECF No. 331-3 at 6.) Sometimes, when a pump's gasket was "baked on with steam," Mr. White would scrape it off with a putty knife or a screwdriver; a task that sometimes took two or three hours, but could take "most of the night." (*Id.* at 6–7.) The gasket removal process could get "a little dusty," and, according to Mr. Dorsett, mechanics like Mr. Whitehead "had the occasion to breathe the dust when that happened." (*Id.* at 7; *see also* ECF No. 331-4 at 11 (recalling that gasket removal generated a "minor" amount of dust).) Mr. Whitehead would also replace broken-down packing around pumps; another process that created some dust. (*See* ECF No. 331-3 at 8.) Therefore, the evidence shows that Mr. Whitehead was exposed to (and inhaled) some level of dust from gasket and packing removal around pumps at the Brewery.

However, even if the gaskets and packing that Mr. Whitehead removed contained asbestos, the record still does not support a finding that Aurora products caused—or even contributed to the cause of—Mr. Whitehead's cancer. Mr. Dorsett and Mr. Draughn testified that there were hundreds of different pumps at the Brewery—not just Aurora pumps, but pumps manufactured by "Viking and Gould," and "a whole lot of other kinds, too." (ECF Nos. 331-3 at 6; 331-4 at 13.) When asked whether Mr. Whitehead worked on Aurora pumps, specifically, Mr. Draughn said yes, though he was not "100 percent" certain. (ECF No. 331-4 at 14.) Mr. Dorsett, too, stated that Mr. Whitehead worked on Aurora pumps. (ECF No. 331-3 at 11.) However, neither could testify as to the *frequency* with which Mr. Whitehead

worked on Aurora pumps, as opposed to other pumps at the Brewery. While Mr. Draughn testified that a "typical" Aurora pump would need a gasket replacement once every three or four years, (ECF No. 331-4 at 17), neither he nor Mr. Dorsett were able to clarify what percentage of the Brewery's pumps were Auroras, such that the Court—or a reasonable jury—could estimate the probability that Mr. Whitehead would have worked on those specific pumps with any regularity. Thus, the only way Plaintiff satisfies *Lohrmann* with respect to Aurora is through an impermissibly tenuous chain: (1) that because there were Aurora pumps at the Brewery, and some Aurora products contained asbestos, Aurora pumps at the brewery contained asbestos; (2) that because Mr. Whitehead was responsible for working on all kinds of pumps at the Brewery, he must have worked on Aurora pumps often; and (3) that because Mr. Whitehead worked at the Brewery for several years, he must have been exposed to Aurora-attributable asbestos material with sufficient frequency, regularity, and proximity. However, to avoid summary judgment, the nonmoving party must rely on more than "the building of one inference upon another." *See Dash*, 731 F.3d at 311. Because the forecast of evidence, even when viewed favorably to Plaintiff, does not demonstrate "a reasonable probability of causation between [Mr. Whitehead's] disease and the products manufactured by [Aurora]," summary judgment is appropriate. *See Lohrmann*, 782 F.2d at 1163.

Citing the Fourth Circuit's decision in *Roehling v. National Gypsum Company Gold Bond Building Products*, 786 F.2d 1225 (4th Cir. 1986), Plaintiff argues that "circumstantial evidence that [Mr. Whitehead] worked around [Aurora's] product for an unspecified amount of time" is sufficient to show causation and avoid summary judgment. (*See* ECF No. 331 at 10.) It is true that an asbestos plaintiff need not have worked directly with a product in order to prove

causation. *See Roehling*, 786 F.2d at 1228. However, indirect exposure to a defendant's product must still be shown to have been "proximate and significant." *See Finch*, 2018 WL 4101828, at *4 (citing *Roehling*, 786 F.2d at 1228). In *Roehling*, for example, the record demonstrated that asbestos material attributable to the defendant was "all over the place" at the plaintiff's worksite; so abundant that the air was regularly "filled with [the] defendant's products' dust." *See* 786 F.2d at 1227, 1229. That is not the case here.

Plaintiff's reliance on *Slaughter v. Southern Talc Company*, 949 F.2d 167 (5th Cir. 1991), is similarly misplaced. There, the Fifth Circuit found sufficient causation under *Lohrmann* where circumstantial evidence showed, in part, that the defendant manufacturer's asbestos-based pipe insulation was removed and replaced throughout the plaintiff's worksite on a daily basis; that insulation dust would regularly cover employees in the area; and that the plant "was a very dirty place to be." *See Slaughter*, 949 F.2d at 170, 173. In contrast to those facts, the record evidence here does not demonstrate, to any significant probability, that Mr. Whitehead was exposed to asbestos-containing Aurora products with regularity or frequency.

Further, Plaintiff cannot satisfy her burden under *Lohrmann* by "presenting scientific and medical literature"—via expert reports or otherwise—"regarding the amount of exposure sufficient to cause mesothelioma." (*See* ECF No. 331 at 14.) The question is not whether Mr. Whitehead's mesothelioma was caused by exposure to some source of asbestos; rather, *Lohrmann* asks whether the evidence would permit a reasonable jury to conclude that Aurora products, specifically, were a substantial cause of his disease. Because the evidence here, viewed in the light most favorable to Plaintiff, fails to establish that Mr. Whitehead was actually exposed to asbestos-containing products supplied by Aurora "on a regular basis over some

9

extended period of time in proximity to where [he] actually worked," if at all, *Lohrmann*, 782 F.2d at 1162–63, Aurora is entitled to summary judgment on all of Plaintiff's claims against it.[4]

## B. Anchor Darling Valve Company

Next, the Court turns to Defendant Anchor Darling Valve Company's ("Anchor") motion for summary judgment. (ECF No. 311.) As with Aurora, Plaintiff contends that Mr. Whitehead "worked with Anchor's asbestos-containing valves, and asbestos gaskets, packing, and insulation associated with those valves" during his tenure at the Brewery. (*See* ECF No. 330 at 1.) However, there is insufficient evidence to show that Mr. Whitehead was actually exposed to asbestos from Anchor valves, or that any such exposure occurred with the frequency and regularity required by *Lohrmann*.

The only evidence of Anchor products being present at the Brewery comes from Mr. Draughn, who testified that he was "pretty sure" there were "some Anchor[ ]" valves there. (*See* ECF No. 312-1 at 23.) As a general matter, Mr. Draughn testified that "if a valve needed replacing" a supervisor "could send [a mechanic] to do it." (*See id.* at 34.) He also estimated that "[i]t could be once a month [that a mechanic] would have to replace a valve" of some variety, though it could also be as infrequently as "once every three or four months." (*See id.*) However, when asked whether he could recall "Mr. Whitehead ever replacing any specific brand of valve"—Anchor or otherwise—Draughn said "[n]o, I can't." (*Id.*) Likewise, when

---

[4] In a final effort to salvage her failure-to-warn claim, Plaintiff argues that Aurora had a "duty to warn of the hazards associated with products that it did not manufacture even though those products may have later been incorporated into or used with its pumps." (*See* ECF No. 331 at 15–16 (citing *Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986 (2019)).) Even if such a duty exists under North Carolina law—and it is not clear that it does—Plaintiff has not directed the Court to any evidence that the Aurora pumps at the Brewery required asbestos-containing parts to operate, or that Aurora provided the Brewery with replacement parts containing asbestos.

10

asked whether he had any "memory of Mr. Whitehead ever replacing or repairing an Anchor valve," specifically, Mr. Draughn again said no. (*Id.*)

Mr. Dorsett did not confirm the existence of Anchor valves at the Brewery, or whether Mr. Whitehead specifically worked on Anchor valves. However, he reasoned that, given the length of time Mr. Whitehead worked there, he would have worked on every brand of valve "sooner or later." (ECF 312-2 at 27.) Thus, at best, considering Mr. Draughn and Mr. Dorsett's testimony together yields the following: (a) there were "some" Anchor valves at the Brewery; and (b) given his job as a mechanic for many years, Mr. Whitehead would have performed work on those valves "sooner or later."

Even when viewed in the light most favorable to Plaintiff, this evidence does not satisfy her burden of production. First, the conditional testimony that a supervisor "could" have assigned Mr. Whitehead to work on a broken Anchor valve, (ECF No. 312-1 at 34), and that he likely "would" have worked on all kinds of valves during his time at the Brewery, (ECF No. 312-2 at 27), is too vague and speculative to establish actual exposure. *See, e.g.*, *Connor*, 2018 WL 6514842, at *5–6 (holding that testimony that decedent "would have been" around asbestos removal was too vague to withstand summary judgment); *Logan v. Air Prods. & Chems., Inc.*, No. 1:12–CV–1353, 2014 WL 5808916, at *3 (M.D.N.C. Nov. 7, 2014) (holding that coworker's testimony that decedent "would have" been present whenever valves were serviced was too speculative); *see also Pace v. Air & Liquid Sys. Corp.*, 642 F. App'x 244, 249 (4th Cir. 2016) (finding coworker's testimony that decedent must have worked with certain products "a lot" because "he worked in the shipyard for 20 something years" to be speculative). Second, the testimony does not speak to the frequency component of *Lohrmann* at all. For example,

11

Mr. Dorsett speculated that Mr. Whitehead would have worked on all types of valves at the Brewery sooner or later; however, when asked whether he could estimate "how many times" Mr. Whitehead would have worked on any specific brand of valve, Mr. Dorsett responded, "No, I can't, I can't say how many times." (*See* ECF No. 312-2 at 27.) In short, the evidence fails to show that Mr. Whitehead was actually exposed to asbestos-containing valves supplied by Anchor, or that any exposure occurred with the requisite frequency and regularity. Accordingly, the Court will grant Anchor's motion for summary judgment.

### C. Fisher Controls International LLC

The same analysis and outcome apply to Defendant Fisher Controls International LLC's ("Fisher") motion for summary judgment. (ECF No. 313.) Plaintiff again alleges that Mr. Whitehead "worked with Fisher's asbestos-containing valves, and asbestos gaskets, packing, and insulation associated with those valves" while employed at the Brewery. (ECF No. 333 at 1.) However, the Court agrees with Fisher that there are insufficient facts to show that Mr. Whitehead "was exposed to any asbestos for which Fisher could be held liable, much less exposure at a level sufficient to satisfy North Carolina causation requirements." (ECF No. 315 at 1.)

As with Anchor, the only evidence tying Fisher products to the Brewery is the testimony of Mr. Draughn, who, after significant prodding by Plaintiff's attorney, ultimately stated that he was "pretty sure" there were Fisher valves present. (*See* ECF No. 333-4 at 23.) However, it is entirely unclear from the record whether any Fisher valves on site actually contained asbestos. In her opposition brief, Plaintiff points the Court to a trial transcript in which a Fisher corporate representative testified that whenever a specific manufacturing

12

number—"17A2"—appeared on an invoice or purchase order prior to 1988, the associated product contained "85 percent asbestos." (*See* ECF Nos. 333 at 6; 333-11 at 43.) The Court fully expected, therefore, to see purchase orders or invoices in the record showing that Fisher products marked 17A2 were delivered to the Brewery. However, there are none. Likewise, Plaintiff directs the Court to general testimony from Mr. Dorsett and Mr. Draughn in which they describe the process of removing gaskets from high-temperature steam valves. (*See, e.g.*, ECF Nos. 333-3 at 7, 12–13; 333-4 at 20.) Mr. Draughn believes that those high-temperature valves "probably had asbestos in them." (ECF No. 333-4 at 20.) However, Plaintiff does not indicate whether any such valves were Fisher's—rather, the evidence shows that the Brewery ran both hot and cold processes, with some valves operating at high temperatures and others at low temperatures. (*See, e.g.*, ECF Nos. 333-3 at 7; 333-4 at 24.) Without knowing whether Fisher valves were used in the high- or low-temperature systems, Mr. Draughn's testimony is unhelpful.

Even if there were asbestos-containing Fisher products on site at the Brewery, Plaintiff's forecast of evidence suffers from the same issue as above with respect to the *Lohrmann* test: the record gives absolutely no indication as to how frequently Mr. Whitehead interacted with Fisher valves, if at all.[5] Accordingly, Fisher is entitled to summary judgment.

---

[5] The federal asbestos MDL court applied North Carolina law and reached a similar conclusion in *Jandreau*, another asbestos case involving Fisher valves. *See* 2012 WL 2913776, at *1 n.1. In that case, the plaintiff alleged that the decedent "was exposed to asbestos-containing component parts in connection with Fisher valves." (*Id.*) There was evidence in the record that Fisher valves were used at the decedents' workplace; that "valves were changed or replaced in the facility"; that the decedent's "job required him to oversee valve changes and replacements"; and "that asbestos-containing component parts were used in at least some Fisher valves." (*See id.*) However, there was "no evidence that any valve to which [the decedent] was exposed was a Fisher valve"; or "that any Fisher valve to which he may have been exposed contained asbestos." (*Id.*) On that record, the court awarded summary judgment to Fisher. (*Id.*)

### D. The William Powell Company

The Court now turns to The William Powell Company's ("Powell") motion for summary judgment. (ECF No. 314.) As with Fisher, Anchor, and Aurora, Plaintiff asserts that Mr. Whitehead "worked with Powell's asbestos-containing valves, and asbestos gaskets, packing, and insulation associated with those valves" at the Brewery. (ECF No. 335 at 1.) However, as above, Plaintiff has likewise failed to produce evidence showing that Mr. Whitehead was actually exposed to asbestos-containing products attributable to Powell with any frequency or regularity.

Both Mr. Draughn and Mr. Dorsett testified to the presence of some unspecified number of Powell-brand valves at the Brewery. (*See* ECF Nos. 335-3 at 13; 335-4 at 23, 38.) Further, Mr. Dorsett stated his belief that the insulation, gaskets, and packing on those valves contained asbestos. (ECF No. 335-3 at 13.) However, this evidence alone is not enough. *See Lohrmann*, 782 F.2d at 1162 (rejecting suggestion that "any evidence that a company's asbestos-containing product was at the workplace while the plaintiff was at the workplace" created a material factual dispute on the issue of causation). To avoid summary judgment, Plaintiff must show, at the least, that Mr. Whitehead was exposed to Powell-attributable asbestos products "on a regular basis over some extended period of time." *See Jones*, 69 F.3d at 716. She has not done so.

When pressed, Mr. Draughn was unable to say "how many Powell valves Mr. Whitehead may have installed, replaced[,] or worked on at the [Brewery]." (*See* ECF No. 335-4 at 38.) Mr. Dorsett, too, admitted that he did not know the frequency with which Mr. Whitehead worked on Powell valves. (*See* ECF No. 335-3 at 27.) Rather, as with Anchor's

valves, Mr. Dorsett could only assume that Mr. Whitehead would have worked on Powell valves "sooner or later." (*Id.*) As discussed above, this kind of testimony is too speculative for a reasonable jury to conclude that exposure to Powell valves was a substantial factor in causing Mr. Whitehead's mesothelioma. Thus, even accepting that there were asbestos-containing Powell valves at the Brewery, summary judgment in Powell's favor is warranted.

### E. Covil Corporation

Defendant Covil Corporation ("Covil") is also entitled to summary judgment on all claims. (ECF No. 316.) Plaintiff alleges that Mr. Whitehead encountered asbestos insulation installed by Covil at Duke Energy Corporation's Marshall Steam Plaint while employed by Bahnson Service Company ("Bahnson") and American Business Service ("ABS") in the 1960s. (*See* ECF 332 at 2.) However, as Covil points out, there is no record evidence placing Mr. Whitehead at the Marshall Steam Plant—or in the presence of any Covil products, for that matter—at any time. While Social Security records cited by Plaintiff show that Mr. Whitehead was employed by Bahnson in 1965 and ABS from 1966–68, they give no indication as to whether those employers assigned Mr. Whitehead to work at the Marshall Steam Plant. (*See* ECF No. 332-2 at 5–6.)

Plaintiff attempts to remedy this oversight by relying on the expert report of Dr. Edwin Holstein, which states that *"[a]ccording to Plaintiff's counsel*, [Mr. Whitehead] was employed by Bahnson Service Company, Inc. while working at the Marshall [Steam Station]." (ECF Nos. 332 at 4; 332-4 at 8 (emphasis added).) However, after submitting his report, Dr. Holstein admitted in deposition that he did not know the factual basis for Counsel's representation that Mr. Whitehead worked at Marshall and could say whether it was true. (*See* ECF No. 317-17

15

at 3–6.) Plaintiff has made no further effort to support Dr. Holstein's statement with factual evidence of Mr. Whitehead's presence at Marshall. Accordingly, the Court finds that there is no evidence whatsoever to support the claims against Covil. Thus, Covil is entitled to judgment as a matter of law.

### F. Viking Pump, Inc.

Finally, the Court examines Defendant Viking Pump, Inc.'s ("Viking") motion for summary judgment. (ECF No. 319.) Sales records indicate that Viking delivered its products to several different worksites referenced in this case. (*See* ECF No. 320-3 at 7.) However, Plaintiff appears to focus its claims against Viking exclusively on alleged asbestos exposure at the Brewery. (*See* ECF No. 334 at 1.)

Although there is some evidence that Mr. Whitehead worked on Viking pumps on occasion, the record does not demonstrate exposure to those products on a regular basis or for any extended period of time. Mr. Dorsett testified that he personally witnessed Mr. Whitehead perform overhauls of high-temperature Viking pumps—which he believes contained asbestos—at the Brewery. (ECF No. 334-3 at 11.) Mr. Dorsett further stated that Mr. Whitehead worked on Viking pumps "several times" between 1982 and 1988, though he could not specify exactly how many times. (*See id.*) As to the number of Viking pumps at the Brewery, Mr. Draughn could not say whether it was "more than [ten]," though he thought it was "[p]robably more than one." (ECF No. 334-4 at 14.) Furthermore, according to Mr. Draughn, Viking pumps usually needed to be serviced "once every three or four years," though it could be as long as "seven or eight years" between servicing sessions. (*Id.* at 17.)

Even viewing this evidence in the light most favorable to Plaintiff, the Court cannot conclude that Mr. Whitehead worked on Viking pumps with the frequency and regularity required by *Lohrmann*. In *Lohrmann* itself, the Fourth Circuit found evidence of exposure "on ten to fifteen occasions" over a four-decade period insufficient to show causation at summary judgment. *See* 782 F.2d at 1163. More recently, in *Young*, this Court applied the *Lohrmann* test and awarded summary judgment to a defendant when the evidence showed thirteen specific instances of exposure over a twenty-eight-year period. *See* 2018 WL 9801011, at *1, 5. In contrast to those cases, the evidence here—which is, on the whole, far less specific—merely suggests that Mr. Whitehead worked on Viking pumps a handful of times during his sixteen years at the Brewery. Without more, a jury could not reasonably conclude that asbestos exposure from Viking pumps was a substantial factor in causing Mr. Whitehead's disease. Therefore, Viking is entitled to summary judgment.

## IV.     CONCLUSION

Based on the foregoing, the Court concludes that Plaintiff has failed to introduce evidence of Mr. Whitehead's exposure to asbestos-containing products attributable to Defendants Aurora, Anchor, Fisher, Powell, Covil, or Viking "on a regular basis over some extended period of time in proximity to where [Mr. Whitehead] actually worked"—if at all. *See Jones*, 69 F.3d at 716; *Lohrmann*, 782 F.3d at 1162–63. Plaintiff has thus failed to establish causation as to each of these named Defendants, and, therefore, each is entitled to judgment as a matter of law on all of Plaintiff's claims against them.

For the reasons stated herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that the Motions for Summary Judgment filed by Defendants Aurora Pump Company, Anchor Darling Valve Company, Fisher Controls International LLC, The William Powell Company, Covil Corporation, and Viking Pump, Inc., (ECF Nos. 309; 311; 313; 314; 316; 319), are GRANTED. Plaintiffs claims against each of the Defendants named herein are hereby DISMISSED.

This, the 18th day of May 2020.

/s/Loretta C. Biggs
United States District Judge